Mr. Court, my name is Mitchell Zimmerman. I represent Petitioner Henry Earl Duncan. I'd like to reserve seven minutes for rebuttal. I'd like to focus, Your Honors, on two ineffective assistance claims today. I'll begin with Claim 17, which addresses Penalty Pays in Effective Assistance of Counsel, and then I'll turn to Claim 5, which concerns the evidence that Mr. Duncan was not the actual killer. Your Honors, in the ten months between the trial counsel devoted only 35 hours to preparation for the case. And that, as the district court found, that included no time spent on investigation for the penalty pays until the morning that it began. As a result, the jury that condemned Mr. Duncan to death wrongly believed that he personally committed a brutal crime to feed a drug addiction he acquired for no apparent reason, after having had what trial counsel characterized as, quote, an absolutely ordinary life, unquote. And they believed that there was next to no mitigating evidence that could be presented on his behalf. Only four minutes' worth was presented. These assumptions were all false. A wealth of mitigating evidence was actually available that trial counsel could have found, except that he never looked for it. The State does not challenge the district court's factual finding that counsel engaged in no investigation for the penalty phase until the morning it began. The State has not attempted to explain how trial counsel's performance could possibly be held not to be deficient when trial counsel did not investigate or prepare for the penalty phase. In light of this, unless Your Honors have any questions that you'd like me to discuss regarding deficient performance, I'm going to turn to and focus on prejudice in connection with this claim. In Stankiewicz v. Woodford, this court held that, and I'm quoting, a penalty phase in effect of a fifteenth claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented. Trial counsel investigated nothing, and consequently he presented only four minutes' worth of mitigating testimony. The discrepancy between those four minutes and the enormous body of mitigating evidence that counsel could have presented is gigantic, and we cannot be confident that, had that evidence been presented, at least one juror would not have found for life without parole rather than for death. I'd like to focus on a number of points that Respondent has not disputed concerning prejudice and show that these, taken by themselves, are ample for a grant of relief. There are a number of important themes established by evidence that was uncontested and uncontradicted by the prosecution and by the state in these proceedings, none of which the jury heard anything about. First, Duncan was repeatedly exposed to serious family violence as a small child witnessing his father attempt to drown his mother, witnessing him choking her sufficiently to require her to be sent to the hospital, witnessing him seeing him threaten her with a gun, and there's uncontested evidence of Dr. Haney that such exposure to violence adversely affects future development of a child. It's also uncontested that Duncan had a history of head injuries and that he had a well below normal IQ of 82, which, by the way, referenced ordinary reference works, puts him in about the 12th or 13th percentile of the population. The jury also never knew that Duncan was raised in Compton, a community plagued by poverty, gangs, lethal violence, and drugs, and that it was a substantial achievement to have avoided gangs and drugs throughout his childhood and high school years. There were powerful humanizing stories that could have been told about him by friends and neighbors and teachers. And he had a life history of passive behavior in which he was guided by his peer group, and when his higher achieving friends and sister left, he lost his way and fell in with his sister's drug-using crowd. The state does not contest that these points were never raised at trial, and the state does not contest and has offered no witnesses to contest the truth of any of these points. A substantial body of Ninth Circuit and other circuit case law that we've cited in our briefs confirms that each of these themes represents... Well, at the evidentiary hearing, they did offer the testimony of, I believe it was Jones? Yes, they did. Who called into question some of the opinions of the experts that were given at the... That is true, Your Honor. Dr. Jones did call into question some of the opinions of the participants. What I'm pointing to now is that Dr. Jones, there's a wealth of other mitigating themes and points that Dr. Jones never addressed, did not disagree with, and offered no opinion on, even nominally inconsistent with that of petitioner's experts. And the points that I've just raised cover those points that he never disagreed with. Taken by themselves, these points are sufficient for relief. So I think these points, just by themselves, on the mitigating side of the balance are quite substantial. On the aggravating side of the balance, what lies in that side? In the spectrum of special circumstance cases, which the California Supreme Court has pointed out are all horrifying crimes, and this Court quoted them approvingly to that, in agreement with that, in its decision and fields. This case is far from the worst. The murder was and we have a defendant with no prior history of violence at all, barely out of his teens when this crime took place. In the spectrum of special circumstance cases, this is a case that involves weak aggravation. And I think if we put together that weak aggravation with the undisputed parts of the mitigation case by themselves, petitioner's entitled to relief in those points themselves are sufficient to undermine confidence. Now when we look at the disputes, or supposed disputes, over the testimony of Dr. Fromming, the neuropsychologist, and Dr. Dudley, the psychiatrist, I think there too we see a number of major areas and major points that are themselves uncontested by Dr. Jones and uncontested by the State. First, the State has ignored entirely the cases that we have cited, particularly Deutscher and Jennings' decisions of this Court, showing that a disagreement between prosecution and defense experts does not restore confidence in the verdict when the petitioner's experts have evidence sufficient to undermine confidence in it. Second, and I think very importantly, the State's only expert, Dr. Jones, acknowledged that the methods used by Dr. Fromming to diagnose organic brain damage offer, and I'm quoting Dr. Jones now, offer useful, valid, and sensitive indicators of the types of brain and behavior dysfunctions in question in this case, unquote. So I think it's fair to say that Dr. Jones expressed skepticism about Dr. Fromming's conclusions. What he did not do was testify that he had a professional opinion that Duncan does not have frontal lobe and right parietal area brain damage. Those areas where there's disagreement between these experts who testified at the evidentiary hearing, how do those disagreements, how does that, or should that, play into the decision of whether or not there was prejudice? Well, I think, Your Honor Do you just take it out or do you just look at it as though the juror should have heard that and given the opportunity to resolve that conflict? Yeah, I think this case is very much, Jennings, I think, provides, this Court's decision in Jennings, I think, provides an answer to that. And Jennings was, in many ways, quite similar to this case. There were defense psychiatrists who were presented in habeas corpus, and there was a psychiatric witness for a respondent who had not himself examined the defendant but who relied on the testimony of another expert. And the Court's conclusion was all of this was stuff for the jury. The jury should have considered this. The jury could weigh it. And, I mean, I suppose we can imagine circumstances in which the State's and negates the methodology of petitioner's expert that this Court could make a decision that the evidence is really insufficient to undermine confidence in the outcome. But that's not the case here. Here we have the State's expert who acknowledges the validity of the methods used by Dr. Fromming, has, you know, something of a critique of it based largely on an inadequate review of the records himself and based in substantial part on reliance on another examining psychiatrist about whom he knew nothing and whom he'd never heard of. I think in these circumstances, this Court examines that body of expert opinion, and I think here can only make a determination reasonably that, taken together, all of this expert opinion is what petitioner's offer is sufficient to undermine confidence in the outcome, and that further consideration of it is for the jury. Perhaps their expert could be devastating in trial, but what we've seen here, I think, we're still at the point where it's sufficient to meet the reasonable probability standard. Does that answer your? Thank you. So also, and I think importantly unchallenged, one of the other things Dr. Jones does not do is conclude that if Duncan did have brain damage, a frontal lobe impairment of the kind that she diagnosed would mean that he'd be particularly susceptible to being influenced by others, to get involved with drugs and commit crimes, and he'd be far more likely to become addicted, and that he'd be less able to be able to decide whether to act independently of the expectations and instructions of others. So I think we just put this package of mitigating evidence together. It's ample to undermine confidence in the outcome. The state's also disputed the, and has raised a dispute about whether Duncan bore the weight of a genetic predisposition toward drug abuse. We believe in that regard the district court applied an incorrect legal standard, requiring us to essentially establish that this testimony could have been presented in 1986 with absolute certainty, and ignored the evidence that clearly showed there were scholarly studies and scientific studies. Counsel, you've used about half of the time that you're not reserving. I'm sorry. You've used about half of the time that you're not reserving. I wonder whether you wanted to address the penalty for, I mean, the guilt for this. Yeah. Let me do that now, then. Thank you, Your Honor. Turning to Claim 5, I think the evidence is compelling, and more than enough to meet the reasonable probability standard that someone other than Mr. Duncan was at the crime scene at the time of the murder and bled. The Supreme Court observed in Strickland that some errors will have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. I think this is plainly such a case. Once we have a body of evidence that I believe is quite persuasive, let alone meet the reasonable probability standard, that somebody else was there and bled, and we combine that with Detective Orozco's testimony that although he considered the possibility of two suspects, in his opinion, quote, only one could have attacked and killed, Eileen DeBorn, unquote, it's obvious that the attacker was the one more likely to be injured in the struggle with the victim and shed type A, B blood. I think this evidence is ample to undermine confidence in the jury's verdict that beyond a reasonable doubt, Duncan personally used a knife to kill the victim. Counsel, I have a question for you. As I understand it, the person who normally mopped the floor did not put in an affidavit saying, I mopped the floor the night before. Is that right? The person who normally mopped the floor, I think the record showed in the declaration of Mr. Fineman was present, but we did not have a declaration from him. We have the So in the absence of a sworn testimony that the floor was mopped the night before the murder, are you so sure that the A, B antigens are the result of a bleeding attacker or co-attacker as opposed to some remnant on the floor from some other incident in the restaurant? I think there are two parts to the answer to that. The first is that in addition to the blood found on the floor, the type A, B blood found there, there's also A, B blood found on the handy wipe rag that was rested atop the lock that the prosecutor argued had been moved in the course of the robbery and that was under the open first aid kit which the police testified they understood to have had bandages missing from it. So I think that the notion that a bloody handy wipe rag would have been around there for days or weeks before is highly improbable, and when you put together that entire constellation and configuration of evidence, it's quite persuasive that this blood was left on the night of the murder, particularly if we consider the nature of the other two places. One of the other places where item five was taken was from a bloody shoe print. I think whatever the evidence on the washing of the floor, I don't think it can be credibly argued that that bloody shoe print had been around for weeks earlier or earlier in the day. In any event, although there's not a declaration from a person who washed the floor saying he washed it, there is both the testimony of Mr. Fineman, the bartender, who testified that it was the normal and ordinary and customary practice for the floor to be washed carefully each night, his testimony that the person who washed it was there, and the two records that the police, not defendant, that the police obtained from witnesses, from two independent eyewitnesses, the police notes of their interviews with them, each testifying that they had seen the floor being washed that night. Now it's true we don't have declarations from those, but hearsay evidence is admissible in habeas, and here I think when we look at this entire constellation of evidence, I think it's quite implausible and very difficult to understand this in any other way, but that type AB blood was in fact shed that night. And certainly that's applying the standard is it sufficient to undermine confidence in the outcome, I think it's ample for those purposes. Okay, another question I have is, let's assume that the trial counsel had blood tests, serology tests done, and was aware of the AB antigens. How could that effectively be presented to the jury? I mean, could that have been presented with just some expert testimony, or would it have required Duncan to testify and tell a story about an accomplice to have any chance of persuading the jury? Well I think part of what's involved in Your Honor's question is, of course, just how should that evidence have been used, and Respondent has asserted repeatedly in this case that it would have required counsel essentially to concede Duncan's guilt of felony murder in the guilt phase. And I think the first thing to be said about that is, of course, it required no such choice. If trial counsel truly believed that the jury, he could persuade the jury to ignore the evidence of the fingerprint in Duncan's blood and that there was a realistic chance of acquittal, I think his approach would simply have been not to put Duncan on the stand, but to present this evidence, scientific evidence, through a serology witness like was there, certainly much more powerful evidence than the kind of evidence that he did present at the trial. Someone was walking by, someone had been fired by the victim a week before. He could have presented that, made whatever attack he thought was credible against the fingerprint expert, and left it at that. With the idea of what? Of showing lack of intent? No. I think under the theory that there was a realistic chance of an acquittal here, I think this would have been part of a showing, Duncan wasn't there, Duncan didn't do it. Now, we don't regard that as plausible, but the district court seemed to think that there was a realistic chance of an acquittal, and the trial counsel was not unreasonable in hoping for an acquittal. If it was close enough that there was a reasonable chance, and I think certainly adding the substantial evidence that someone else actually was there would have enhanced that. Your answer to Judge Gould's question is that they could have introduced the evidence of the blood of another person without having Duncan take the stand. That's right. They could. They could have introduced that. I think counsel could have, and probably much more realistically would have taken the view there is no realistic chance that the jury is going to ignore uncontradicted fingerprint evidence of Duncan's prints in the blood of the victim. If they did, he could have presented without it, but realistically that was never a realistic prospect. He could, I think, have presented this evidence through an expert witness to demonstrate someone else was indeed there and made the kind of arguments that we've made here today, that the most reasonable inference from that is that the other person was the sole attacker, particularly in light of the evidence of the police officer to that effect. Now, from that, I think a number of inferences are possible. And let me say I think this approach is a reasonable one, precisely because I think the evidence of Mr. Duncan himself as to what happened would have been subject to attack as self-serving. Here we have objective scientific evidence indicating someone else was present. And I think if that evidence has been presented, he could argue two things. First, regarding the penalty, is at least not a substantial argument that Mr. Duncan was not the actual killer. And myriad cases have held that that's a critical determination that the jury examines in determining whether to inflict death or not. And this court has held that even uncertainty as to that is strongly mitigating. So certainly I think that evidence is sufficient to undermine confidence that a jury would have decided death was appropriate. I think it also undermines confidence in the necessary intent to kill or intent to aid in a killing requirement for the special circumstance. There was only one special circumstance here, robbery murder, and that special circumstance required a jury finding that Duncan either intended to kill or intended to aid in a killing. The jury expressly found that Duncan intended to and did kill. And that, but I believe that finding has been undermined, the evidence that someone else was there and was more likely the actual killer. In the context of the finding they did make that he was there. What would the effect be if you were correct and the evidence could have been introduced that showed that there was someone else there? Would that necessitate setting aside the special  Yes, it would, Your Honor, because I think it clearly undermines confidence in the conclusion that Duncan killed and intended to kill. And the question we're left then is one that the jury never examined. Did he intend to aid in a killing? And I think for that we're talking about now a completely different picture of the entire case. I think it's impossible to be confident had that been the posture of the case in a completely different view of the murder than the one that the jury had, that the jury would have found beyond a reasonable doubt that Duncan intended to aid in a killing. So I mean I think we've seen irrational conduct of Mr. Duncan's before and after this. And I think it's easy to imagine scenarios, and we painted some of them in our brief, pursuant to which he could have believed, foolishly perhaps, we're talking about a young man with limited IQ whose function has not been improved by drug addiction either. He could well have thought, we'll rob her, we'll take the money, I'll run away, I'll never be seen again. Or they could have been surprised to discover that she was there, believing that this would be a theft, not a robbery, and the other participant could have been the one who killed without his involvement. I think quite plausible if you consider the, particularly if you consider the psychiatric and other evidence that's been presented in conjunction with Claim 17, consider that altogether. I think it's very plausible that this young man with no prior history of violence at all or serious crime, I think it's quite plausible that he would not have understood what was going to happen. He did not participate in a plan that involved the intent to kill the victim. Now, yes, Your Honor. Go ahead. I didn't tell you it was six and a half minutes. Okay. So I think that evidence is, those scenarios are entirely plausible. I think the question of what the jury would have believed about them is unclear. The jury would have had to find beyond a reasonable doubt that Duncan intended to do aid in a killing, and I think we cannot be confident that the jury would have done so. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honors. Scott Tarl from the Attorney General's Office on behalf of the appellee. Unless the Court would find my time spent better otherwise, I would like to first address Claim 5, the last claim that my opposing counsel addressed. And as Judge Gould, as Your Honors, you validly pointed out, there are serious doubts and serious questions about the origins of these three drops with the AB antigens. There are serious doubts about when they might have been deposited, and I know that counsel mentioned one of them being in a bloody shoe print. A shoe print is a very likely place for cross-contamination. A shoe can pick up a lot of things from a lot of different places. But I would like for a moment just to indulge the Court to assume for the sake of argument, just for a moment, that all of the various inferences that Duncan wants to draw from these three the night of the murder, and that they were somehow connected with the murder. I would like to point out that they don't need to be months old or weeks old to be unrelated to the murder. There is an ongoing business, an ongoing restaurant work going on that very evening. But anyways, assuming that they did prove everything Duncan wants them to prove, presenting the kind of defense theory that Duncan is now urging that should have been fraught with danger had it been offered a trial. And the danger is that taking the inferences most favorable to Duncan, it would have simply placed another person there, another person actively involved in the murder. The blood evidence by itself wouldn't have diminished Duncan's role in the crime, certainly not considering that Duncan is the one that has the victim's blood on his hands. Duncan has bloody fingerprints all over the wall. Duncan has the key to the safe. Duncan admittedly stole money before. Duncan has a cocaine habit. Duncan was seen loitering in the- But how does it make it worse? What do you lose by doing this? It would make it worse because now the jury would have in their mind the vision of two attackers attacking- And why is that worse than just Duncan being the sole attacker? Because two attackers makes the crime sound even all the more savage. We have a helpless victim cornered in the confines of the money room and two people acting in concert. A lot of- Well, maybe not two people acting in concert. Maybe one person doing the stabbing. But we can't draw that inference necessarily from the blood. And it especially would be very difficult, if not impossible, Your Honor, to draw that inference from the three blood droplets without calling Duncan to the witness stand. And that's another- Why? I don't understand what the disadvantage is. And I wish you would explain it. Why Duncan's better off if they think there are two people than if they think he's the sole attacker? Why he's worse off if they think there are two people. Because in the minds of many jurors, perhaps any juror, a crime by two people acting in concert wielding knives against one's helpless attack. It's two people surprised her at midnight in a deserted terminal and took advantage of her and both savagely attacked her. If that is the theory that the defense- No, the theory would have to be that the other person was the attacker. There's no proof would be the theory that it was Duncan. You had two people there. The other person's blood is found, not Duncan's. And therefore, that it raises a doubt as to whether Duncan was the attacker. Well, very minute amounts of blood. And again, it doesn't- Well, minute are a lot. It's the only blood that's not the victim's. But also Duncan's fingerprints and palm prints are- No, no. I understand the fingerprints and palm prints, but- And furthermore, a key piece of prosecution evidence which would make that very problematic is the cashier's sheet that's signed at the end of every shift. And Duncan and every cashier routinely always signed that except on the night of the murder. And the prosecution's theory was that Duncan did that to give himself an excuse to enter the money room. Excuse me, ma'am, I need to come in and sign my sheet. I forgot to do so. That would mean Duncan would have entered first. And then regardless of who shed a few drops of blood, it would paint a picture of Duncan being very much involved, literally up to his elbows in this crime. Not much worse than it already was. Well, again, defense counsel is in an unenviable position, which I think- It's not a good case to have to defend. Right. But given that, and given all that there was against Duncan, it's hard for me to see how there's a disadvantage to Duncan to showing that there's somebody else's blood in the room. That's what I'm trying to understand. Why? Maybe it would have no effect. And maybe it would help. Or maybe a jury would say, we can't say beyond a reasonable doubt that Duncan was the one who killed her. That's possible. But I don't see how a jury's going to say, ah, the alternative is he killed her by himself and did all of these terrible things, or there was somebody else. The worst that could happen to him is there was somebody else also. But again, I would submit that two attackers against one would be aggravating. But also, I think- That would be the disadvantage, you say? That would be one of the disadvantages. But another disadvantage is that to prove that was an accomplice, you literally would have had to present Duncan on the stand. Because otherwise, there would be a big hole in the defense evidence. The jury couldn't help but ponder, why aren't we hearing who this other accomplice is? There's case law from this court saying that phantom accomplice theories, without a shred of evidence pointing to a particular other accomplice, are not impressive with juries. And they're going to wonder, there's somebody who's got direct recipient knowledge. If he truly was involved in this case- Aren't they going to worry, wonder that when he doesn't take the stand now? How's it going to be worse? It's the same thing. He doesn't take the stand. If you're saying they're going to wonder, why didn't he take the stand? Well, that's true in both instances. Well, but now he's, by not taking the stand, he's protecting the identity of this phantom killer. And that goes to this lack of remorse also. He's- Well, we are talking about that. We are talking also, though, about the penalty phase with all due respect, because Duncan is claiming that this was prejudicial to the penalty. All right. Well, I was hoping you would sort of address the claim five first, which-     The victim is not guilty of the crime. I mean, Duncan is claiming that the claim five, ineffective assistance, I think, I believe his primary argument is its impact on penalty, that a jury with this picture would have had a different- Well, I think his argument is that it also carries over to the effect on penalty. Well- But we're trying to separate this, and it's up to you, but- Okay. I was trying to separate it into guilt phase and penalty phase, at least in my mind. And I am concerned about your argument about why it was- the reason that it would be helpful to Duncan not to show that there was another person who may have been the one who stabbed her. Well, Your Honor, I would like to address guilt phase, as you suggested, because, Your Honor, as noted, it does require both either an intent, either being the actual killer or having it in a bed with the intent to kill. Duncan is an employee at the restaurant, very well-known to the victim. The victim could easily identify him, and in that sense, this case is very much like the Siropong's case, which I cited in the 28J letter, where this court found it extremely unlikely, and not to rob the victim and leave her alive to identify him, and especially when you consider all the other circumstances of planning here. And that's why I would find- I would submit that failure to present, or excuse me, that if this evidence of the AB antigens had been presented, it would not detract from the special circumstance finding, even if another person is there, which again relies on a lot of leaps and inferences from three droplets, but even if you find somebody else were there, you would still have Duncan with the motive, Duncan apparently engaging in planning activities, his presence undoubtedly at the scene, the victim's blood on his hands, and him with the proceeds of the robbery and the key. He's clearly an active participant. He clearly has the intent to kill. Otherwise, there was no way he would be able to get away with this crime. There's no evidence that he planned to flee the scene. He's at the airport. There's no evidence that he's going to take some of this thousand dollars in cash and get on an airplane, that he's never going to come back. He came back to work on his next scheduled shift. I'm going to check my time, because I did want to also address the other claim, but if there were any more questions about Claim 5. On Claim 9-17, which is in effect of assistance going to the penalty phase, the thrust of Duncan's argument, as I see it, is that the various expert testimony could have been presented, which should have explained why Duncan became a cocaine addict, or why Duncan had a cocaine habit in any event. And after years of habeas investigation, they have failed to prove that. And the district court made a finding that all of the expert testimony, which the court meticulously laid out in its order, would not have made a difference in the penalty verdict. Yes. Putting the expert issues to the side, and the cocaine use theory to the side, isn't there a problem in that if the counsel doesn't investigate and call witnesses to humanize Duncan, and instead presents evidence that more or less demonizes him? In other words, his cocaine theory didn't really humanize the guy. And it didn't seem like he investigated whether he could call people who knew Duncan to testify. It seemed like he was a good guy who went wrong. He shouldn't be put to death. Well, Your Honor, I obviously would agree that humanizing the defendant is typically a very good penalty phase strategy. But I would suggest that the strategy that trial counsel actually pursued at trial, or the evidence that was actually presented, was more humanizing than the theory that Duncan is offering now. And the reason I would suggest that is that the theory Duncan is offering now is essentially that because of various reasons, organic brain damage, a genetic predisposition, whatnot, that Duncan was hardwired, hardwired to be a cocaine addict, and hardwired to eventually commit crimes like this in order to feed that habit. The penalty phase evidence that was presented at trial from family members was that Duncan was a good-natured person for most of his life, that he was an easygoing person, that everybody got along with him, that he stayed away from gangs, that he did a decent job in school, that he had a normal family life, and that if you just look at the last year, year and a half or so of his life, when things suddenly went out of control, he's young, he's only 20, he made a bad choice in life, he got involved in cocaine, and now everything has spiraled out of control and turned him into what happened on the night of the murder. That at least shows the jury that he was an ordinary human being, that perhaps there was a hope that the jury would, at least under that theory, have decided, send him to prison for life, but spare his life because of the person that he was up until he became involved in cocaine. Now, frankly, I think the jury was probably more interested in the person that he was on the night of November 13, 1984, than the person that he was before, but that was a reasonable type of penalty phase to present. And you instead presented a lot of evidence of a traumatic childhood, and by the way, I would strongly disagree. I think it's a highly exaggerated case of a supposedly traumatic childhood. But if you present all this, he's predisposed to violence, he's predisposed to, he's hardwired to a criminal life essentially, that's going to present a less sympathetic picture to a jury. As I understood the theory, it was that he was predisposed to being influenced by others, that he was sort of a follower rather than a leader, which would have tied right in with the theory that there was someone else there who was the actual killer. But I thought that their theory at present is that while he was with his one sister, with the friends who were going on to college, that he behaved well, and they all left, and then he fell under the influence of this bad group of people. Well, again, I would, to an average jury, the fact that he fell in with the bad group, it's still about choices. And that's why it wouldn't have been a persuasive thing. The jury would still have wondered, okay, he, because of all these things, he fell in with the wrong crowd. He became the monster that committed this atrocious act. They referred to him as the madman. Trosky referred to him as the madman. Well, Trosky said hypothetically, a madman must have done this crime, and you members of the jury have decided so be it, that it's my client. But turned him into the madman that committed this act. The jury might not care why he became a madman. And the jury might say, well, but he is a madman, for whatever the reason. The other problem, though, I know that Your Honor, Judge Gould asked me to disregard for a moment the problem of the experts and all of that. But I think you can get back to it. Okay. It's in my mind, and I was thinking of that Mayfield opinion that the Ninth Circuit did, where the failure to bring out positive aspects about the defendant was thought significant. Now, it just seemed to me that that wasn't mutually exclusive with the cocaine expert theory. They could have both been brought out, I suppose. Perhaps they could have both been. Yes, Your Honor, perhaps they both could have been brought out. You could theoretically throw the kitchen sink at a jury, but there would be, at some point, a little bit of disconsonance here. Because even if the evidence is being offered to only show that he's susceptible to peer pressure, as Your Honor, Judge Reinhart pointed out, the jury may nevertheless take it as evidence that he's hardwired to be a criminal. And that could go against the easygoing, good-natured child and young adult that the other part of this penalty-phase strategy would be trying to present. Also, I'd like to point out that, as the district court found, a lot of the evidence of his background, the positive character evidence, was presented. I know that counsel points... I know that counsel pointed out that, as the district court found, a lot of the evidence of his background, the positive character evidence, was presented. And then that morning, I had a brief discussion, but that there was no preparation of the witnesses to bring out more than a very cursory answer. It does help to discuss all of the things with witnesses that could be brought out, but just to put witnesses on the stand without any discussions with them. It's not a way to present a life-or-death case. There were discussions. I don't think there's a claim that there was never a discussion, and I do realize there's the evidence about the meeting at the last minute during trial. There was also evidence in the record that counsel had made many attempts to call meetings and to get family members or people in the... or acquaintances of Mr. Duncan to talk to him, and he was rebuffed several times that people were, quote, disgusted with Mr. Duncan and didn't want to have anything to do with him. But regardless, either way... Did he send his investigator out to talk, to reach these people? That, I apologize, but that I'm not positive from the record. And also I'd like to point out with the 35 hours of preparation that there was also a... that was based on the records from when he was appointed counsel by the court. But previously to that, he was retained counsel by the family and had worked the case up through the preliminary hearing. Now, as far as whether that went to penalty phase evidence or guilt phase evidence or what have you, it's simply just... When I read all of this about the penalty phase, it's like Judge Gould said, you come away with a lack of... it's difficult to understand what Trosky's strategy was and what his goal was, and he puts the sister on Lois to talk about her experience. Lois is the one that used drugs. And it kind of backfires on him. I don't know that it backfired on him. It's like there's just not a feel for that this guy had a strategy, an overall theme that he wanted to convey to the jurors. It's completely lacking in anything. And his records show that he didn't do very much other than, as Judge Reinhart said, the night before and on the morning before the penalty phase began. That counsel didn't do much. As I understand the record before the district court, the State really didn't quarrel extensively about deficient performance and failing to investigate. I mean, the State's focus has always been on prejudice, it seems. And correct me if I'm wrong, but that's what the district court seems to have conveyed in her order. And I would confess that my emphasis has been on prejudice, too, in most of this argument. I think that we certainly acknowledge that the district court found no prong one of Strickland when it comes to the background character evidence, although the district court did find deficient performance regarding the cocaine experts. Habeas counsel did far more than 35 hours worth of preparation. Habeas counsel has been investigating this case for years, and I see what they have come up with. And what they've come up with doesn't really amount to a much more compelling mitigating case than what trial counsel was meant to offer. There are a few other witnesses that also talked about his easygoing nature, but again, the jury will say, well, then, what happened on the night of the murder? And when counsel talks about organic brain damage, it's with a highly unconvincing report by Dr. Bronk-Froeming. And I would like to point out that they claim that Dr. Jones, our respondents expert, endorsed somehow the methodology used by Dr. Bronk-Froeming. Quite to the contrary, Dr. Jones stated that she did not use standard neurological testing even for those times, that she did not use any kind of brain imaging or scanning, which we would also use now, before she could state to a degree of medical certainty in her opinion that he suffers from brain lesions, and that she didn't even use the right norms when scoring the various pencil and paper tests that she did use, such as the Wisconsin card sorting tests, and that several of the scores that she did achieve or that Duncan did achieve on those, she mischaracterized them when placing them on the low norm rather than within the norm. Well, I ask counsel, what do you do with that conflict? Oh, yes. So counsel says, well, you know, in our case law, that's really, that conflict should just, should be resolved by the jury. The conflict isn't always. I think the bottom line, even with Jennings and Deutscher, is you have to have evidence, even if it's expert testimony, that will undermine confidence in the verdict. And to evaluate that, you have to look at the credibility of what was put on, because a habeas attorney can get an expert to state almost anything. And the law says you don't look at just the ipsa dixa of the expert. The value of an expert is really on what the basis of his or her opinion are. Well, if the habeas attorney can find an expert to say almost anything, then so could the defense attorney. And then the jury would decide which expert he believed, it believed. And all you need is one juror to believe the defense is expert. Well, the test, though, isn't. I mean, habeas attorney, then so could the trial attorney, have come up with an expert. Well, first of all, a habeas attorney has years of preparation and the benefit of hindsight, which the trial attorney doesn't have. But also, the test isn't really. Well, maybe if you took more than a day to prepare the penalty verse, you'd have a little bit of time to find the expert. True, Your Honor. You know, the judge asked, do you want some time for the penalty phase? And the lawyer said, no, let's go ahead tomorrow. Right. Which I find rather unusual if you haven't really done a serious investigation prior to the penalty phase hearing. I mean, why wouldn't you want time? Unfortunately, Your Honor, I can't answer that, because unfortunately we don't know everything that might have gone into that decision. We don't know what conversations happened. Like what else the lawyer was doing. You know, what other cases he had. What Duncan might have been saying to him. I know that it's outside the record, but I'm aware of other capital cases where the client just wants things to progress quickly because they think they can get a better result, whatever. I don't want to speculate there. Again, that's outside the record. But the test isn't whether or not trial counsel could have gotten any expert to testify as to any possible conclusion. It's whether this would have made an impact on a jury, whether this undermines confidence. Had trial counsel gotten Karen Bronk-Froeming, for example, back in 1986 to state what she stated, and presumably the people would have had an opportunity to reflect that, would that have made an impression on the jury? And we have the psychiatric report of Dr. Markman, who is a psychiatrist. Dr. Bronk-Froeming is not a neurologist, not a psychologist. I mean, is a psychologist, not a psychiatrist or an MD. And he administered testing on Mr. Duncan and found him in the high normal in intelligence and backed it up with some data. He performed standard neurological testing. Interesting anecdotes, he discussed the pros and cons of the Vietnam War with Mr. Duncan, and Mr. Duncan proffered various things. Mr. Duncan named all the presidents from Clinton back to Eisenhower, I believe it is. Mr. Duncan named the three warring factions in the former Yugoslavia as Bosnia, Serbia, and Croatia. All of these things, and Mr. Duncan apparently was able to plan a crime like this. So I would submit that the test is not whether some expert could have been offered at trial or some expert can be offered on habeas corpus. It goes to the bottom of the line of how credible that expert would have been at trial if presented. I'd like to just point out a quick fact that goes also to Dr. Bronk-Froeming's opinions that one thing that she stated as a possible, as a very likely cause of the brain damage that she opined existed was chronic cocaine abuse. And when Duncan is now offering her opinion to prove that organic brain damage was a causal factor that led him to cocaine addiction, and we have Dr. Bronk-Froeming offering an opinion which is the converse, that chronic cocaine abuse, which she would have observed by 1994 the first time she examined him, could have been the cause of the brain damage. That also undermines confidence in what she has to say and undermines any claim that her opinion undermines confidence in the penalty verdict. I'm aware that the court expanded the Certificate of Appeal ability to include three other claims, and would the court entertain any argument or wish to hear any argument on those additional claims, the juror misconduct, the prosecutorial misconduct? Well, I think your opponent didn't argue them. They're briefed, and we can consider those in the briefs. Okay. I would just summarize. Counsel was faced with a very difficult case, as the court has acknowledged, fingerprints and palm prints linking Duncan to this crime. Counsel had a very tantalizing piece of defense evidence available to it. The first time the police examined Duncan's fingerprints, they failed to match them to Mr. Duncan. It would be hard-pressed to find a defense attorney that wouldn't very seriously consider or want to use a piece of evidence like that, rather than just concede Duncan's presence at the crime scene, concede Duncan's guilt of the verdict, place Duncan more than halfway on the way to death row, and put all of his eggs in the basket of hoping for a better penalty defense. All things being considered, yes, perhaps counsel could have made more of an investigation in this case, but I would submit that Duncan has not showed enough of a showing of what that investigation would have led to, either an acquittal on any element of the guilt or the special circumstance, or a more favorable verdict in the penalty phase. Thank you, counsel. Ron, just a couple of quick comments on Claim 5. I think one thing very important is that defense counsel in a capital case and in any murder case has to look at the evidence in the record carefully and hard and has to make some hard decisions. And one of the hard decisions here certainly would have been, do I concede the defendant's presence or do I contest it? And here, I think one thing that bears on that is that at the preliminary hearing, the police fingerprint expert who missed the match initially explained how he came to miss it initially and explained that at the time he didn't have the palm prints of Duncan and that when he had the palm prints, and I think there were three palm prints at the crime scene, he made an absolute match on them. So I think the plausibility of relying on that initial mistake is quite low. But in any event, if he had decided, gee, that's a strong argument, notwithstanding the fact that an expert who's not contradicted is absolutely certain these are Duncan's prints, if he thinks he can get past that, if anyone reasonably thinks it is that close a question, then the answer is also put on the evidence that someone else actually was there. So it's really just not an explanation for why not use this evidence that counsel thought, I think, deluding himself that there was any chance of an acquittal here. Now, Respondent continually raises this kind of specter of how horrible it would have been to put on evidence that two people had attacked the victim concurrently. But, of course, counsel ignores the fact that there was evidence of a police officer that the likeliest way this crime happened was that there was a single attacker. So I think certainly ample to establish, to undermine confidence that a jury would have found beyond a reasonable doubt that Duncan was the sole killer and attacker. Now, the argument that somehow this would be more aggravating if he did not identify the accomplice, the truth is, the record is entirely silent on that question. There's nothing in the record that says one way or another whether Duncan would have testified or should have testified or could have testified. We believe that whether he testified or not, there's a substantial argument sufficient to undermine confidence that a jury either would have come in for death or would have found that Duncan intended to aid in a killing. Now, I'd like to turn to some of the questions that have come up regarding Claim 17. First, I think there was a finding of fact, notwithstanding the speculations of counsel about other activities, that trial counsel may have engaged in, there was a finding of fact that his investigation began the day after the guilt phase was over, which is to say the morning of the penalty phase, which began, the record shows, at 9.30 that morning. There is also in the record the declaration of, I believe it is Mr. Moore, who was trial counsel's investigator, unequivocally stating that trial counsel never asked him to investigate anything about Duncan's background or find character witnesses for him. So there was no other investigation than that recorded in his timesheets. The notion that, I think makes no sense, that in addition to the 35 hours after having been paid $2,500 to do the preliminary hearing, that trial counsel would have engaged in any penalty phase investigation at that time, I don't think makes any sense at all. He had not been appointed for the entire case, he was covering the preliminary hearing, he certainly would have not engaged in a penalty phase investigation or anything that traditionally would have been considered one at that point as part of a $2,500 payment. Now, counsel argues that it would be better not to present the psychiatric and neuropsychological evidence of Duncan's guilt because its thesis is that Duncan was hardwired to crime. Well, that is not an accurate characterization of petitioner's position here. I think what our position is, he's not hardwired to anything, we've never taken the position that he was absolutely and completely predetermined to become an addict. What we did say was that trial counsel's view and presentation was Duncan had had an absolutely ordinary life. There was nothing wrong with him, and under trial counsel's presentation, it was totally Duncan's own personal responsibility because of his weak character that he became a drug addict. And there's a substantial body of evidence that indicates there were things that impelled him in that direction, including brain damage, including regardless of brain damage, low intelligence, and that these factors and the psychological burdens he was under moved him in that direction. That, I believe, in addition to... Was there evidence presented about his home life, about his father beating his mother, or the alcoholism in the family, or whatever disadvantageous home life he had? Was that evidence presented at the original trial? No, not a bit of it. All the kinds of evidence that I've discussed here today, not only was trial counsel limited to limit himself essentially to four minutes worth of actually mitigating evidence, none of these themes was touched on at all. The jury heard nothing about family violence, they heard nothing about a family history of alcoholism, they heard nothing about the possible impact of it on him. They didn't even know he lived in Compton, they didn't know about the poverty or gangs that were around him, they heard nothing whatsoever about the climate of extreme violence that followed him around all the time his entire life. Thank you, counsel. The case just argued will be submitted. The Court will stand in recess for the day. The Court stands in recess.
judges: Reinhardt, Gould, Paez